ELDER et al. v. WESTERN MINING CO. et al.

(District Court, D. Colorado. January 21, 1919.)

No. 6344.

1. MINES AND MINERALS ⬤⟳105(2)—LEASE BY MINING COMPANY NOT FRAUDULENT. .

Evidence *held* not to sustain allegations in a bill by minority stockholders of a mining company that a lease of the company's property and extensions thereof were the result of conspiracy and fraud between the officers of the company and lessee.

2. MINES AND MINERALS ⬤⟳105(2)—ESTOPPEL OF STOCKHOLDERS TO ATTACK VALIDITY OF LEASE.

Minority stockholders of a mining company *held* barred by estoppel and acquiescence from maintaining a suit for cancellation of a lease of the company's property and extensions thereof, where from time to time during 15 years between execution of the original lease and suit they were advised by circulars from the president that the property was under lease and also received and retained dividends, without objection, knowing that they were from royalties under a lease.

In Equity. Suit by Rufus C. Elder and others against the Western Mining Company and others. Decree for defendants.

Elder & Elder, of Denver, Colo., for plaintiffs.
Dubbs & Vidal, of Denver, Colo., for defendants.

LEWIS, District Judge. This stockholders' suit was begun December 3, 1914. Its purpose is to obtain a decree canceling a lease

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

given by the Board of Directors of the Adams Mining Company to Samuel D. Nicholson and two extensions of said lease made by the Board, and compensation for transportation of ore from other properties through the underground workings of the Adams properties. The complaint was fully considered, and held to state good causes of action, in 237 Fed. 966, 150 C. C. A. 616.

The defendants, by their answers, some joint and some separate, plead in defense estoppel and ratification by stockholders. The charge of fraud and conspiracy is denied, and statutes of limitation are set up.

When the issues were made up they were referred to a Master to take the proof and report his findings of fact and conclusions of law. He was directed, by order of court, to defer the taking of any testimony on the accounting demanded in the complaint for the value of ores taken from the Adams Company properties until it could be determined whether the complainants were entitled to recover at all; and for that purpose to confine proofs to the other issues. This was done because it was apparent that the taking of the account would involve a long and tedious investigation, and would be wholly useless if the defenses in the answers should be sustained. Although it appears that smelter values of ore produced under the lease and extensions up to 1916 exceed three million dollars, yet some of it could not have gone out if it had not been for increase in market values due to the European war. The Master has taken the proof as directed and made his report, in which he recommends that the bill be dismissed on the ground that the complainants and other stockholders are estopped to obtain the relief sought because of their laches and acquiescence. To this report of the Master the complainants have filed exceptions numbered up to forty, with many sub-heads under several of the numbered exceptions, and the defendants have filed fourteen exceptions. These exceptions have been elaborately argued on both sides and voluminous briefs have been filed by counsel. The exceptions, all told, opened up every controversy in the case, and the arguments, both oral and written, deal with every conceivable issue, both of fact and law, with commendable zeal and industry. This has necessarily required a reading of the testimony, covering more than three thousand pages, and an examination of the exhibits, numbering about nine hundred. I will set down the material facts, as I find them.

## I.

1. In January, 1899, the Adams Mining Company was, and for many years theretofore had been, the owner of 9.924 acres, comprised in lode mining claims in Leadville, and in that month it gave a lease on that property by action of its President, approved by its Board of Directors, to Samuel D. Nicholson, for a term of nine years and eight months, from May 14, 1899, to January 14, 1909. The royalties were specified. The lease discloses that the Maid of Erin Company, another corporation, owned contiguous lode claims on the west (15.477 acres), and the Wolftone Company owned contiguous lode claims on the east (22.645 acres), and expressly provides that it shall only be valid upon the completion of ten-year leases on those contiguous tracts. It

required the lessee to enlarge the shaft then on the Wolftone property from 4x8 feet to 4½x14 feet, to a depth of 900 feet, and to put in machinery capable of raising 2,000 gallons of water per minute 1300 feet, and to enter the Adams ground from that shaft for development, drilling and mining below that depth within two years, and also to sink the Wolftone shaft to a further depth of 1200 to 1300 feet. The lease required the lessee to pay all taxes and to keep the improvements insured against fire. The lessee was given the privilege of assigning the lease to a corporation to be formed. As required, the lessee obtained leases on the adjoining ground, the three leases being uniform as to royalties and other conditions. The Erin Company appears to have been largely controlled, at that time, by the late David H. Moffat, and the Wolftone by E. B. Hendrie, both then well known and successful in business. The properties of the three companies had theretofore been mined. A long-term lease on the Adams Company properties had just expired and had not been successful, though the company had realized some returns from the operation. The great burden which seemed to baffle future development in all three of the properties was the heavy flow of water in the lower workings, which were submerged at the time the leases were given; and this burden, recognized by all parties, accounts for the large acreage required by both lessors and lessee in the one venture. It was realized that future development at greater depth must be put on a large and expensive scale or not at all. In June, 1899, James J. Sylvester, then President of The Adams Mining Company, who had signed the lease on its behalf, issued and sent to stockholders of the Adams Company a printed circular letter advising them that a lease to run for ten years had been given to responsible parties on the company's property, and that the lessee, as a part of the compact, had closed leases on the two adjoining properties. The letter contained a plat of all the properties covered by the three leases. It set out the royalties that were to be paid under the lease, the required enlargement of the Wolftone shaft, the requirement that a new pumping plant capable of raising 2,000 gallons of water per minute so as to drain all the property named was to be installed, that all of the directors and all available stockholders had approved the lease, and said, in closing:

"We should be glad to have this acknowledged with your approval. All letters and inquiries cheerfully answered. Yours truly, Jas. J. Sylvester, Pres't."

This circular letter was offered by complainants as their Exhibit 1. Nicholson assigned the lease to the A. M. W. Company. It operated the property for about a year and a half, and then the lease was assigned by it to the Western Mining Company, which has continued in operation of the three properties ever since. Nicholson, however, has always been the directing head of those two companies. The lease to him was filed for public record with the County Recorder at Leadville on May 20, 1899. Before any ore was mined and taken from any of the properties about $200,000.00 was spent in the enlargement and retimbering of the Wolftone shaft, equipping it with machinery for hoisting and pumping, and the construction of a 100-ton mill on

the Adams property. On June 1, 1904, Sylvester, as President, and Storey, as Secretary, gave a written extension of the lease which would have expired January 4, 1909, to January 1, 1914. The extension did not modify the lease in any other respect. That action met with the approval of the Board. This five-year extension of the life of the lease was given, it will be observed, four years, seven months and thirteen days before the original lease would expire. About the time Nicholson got the extension of the lease on the Adams property he asked for extensions of the leases from each of the other companies. He talked to Mr. Moffat about an extension by his company first. All of them made extensions. The Wolftone Company, however, only promised an extension, and Nicholson did not obtain a writing to that effect from it until 1907, when it gave an extension for ten years from January 1, 1909. Nicholson testified that his reason for asking for extensions in 1904 was that, owing to the changed character of the ores it was necessary to make a change and enlargement of the Adams Company's mill, to deepen the shaft on Adams' ground and to connect that shaft at a lower level with the Wolftone shaft, and that before going to that expense he asked for the extensions in order that he might feel safe in making the additional outlay. Those changes and improvements, he testified, required from $50,000 to $60,000. He stated that condition to the different lessors, and the Board of Directors of the Adams Company, in their approval of the extension, entered upon their minutes of June 1, 1904, made this recital to the resolution granting the extension:

"This extension is made necessary by the changing of the character of the ores, which necessitates an expenditure of from Seventy-Five to One Hundred Thousand Dollars by the Lessees who were not willing to do this unless the life of the lease was extended."

There is uncontradicted testimony from experienced mining men that extensions of mining leases made under conditions represented by Nicholson to exist at the time he applied for these extensions is not an unusual practice in the Leadville district, and that such extensions have been made prior to the expiration of leases where the lessee is confronted with the necessity of making large improvements in order to put the property in better shape for production, which would be to the benefit of others who may come after him if he is required to surrender at the time provided in the original lease. The capital stock of the Adams Mining Company is divided into 150,000 shares, and prior to the time of giving the extension the following dividends had been paid on that stock from royalties under the Nicholson lease, each dividend being at the rate of five cents per share: In 1900, two dividends; in 1901, two dividends; in 1902, three dividends; in 1903, three dividends. In October, 1899, Sylvester as President of the Adams Company, issued and sent to stockholders another printed circular in which he refers to "the consummation of the new lease," and stating the amount of work done by "the lessees" up to that time on the Wolftone shaft, and embodied other data which he thought might interest the stockholders (Complainants' Exhibit 2). And during the years that the ten dividends above-mentioned were paid, Sylvester as

President of the Adams Mining Company, issued and sent to stockholders a number of other circulars (Complainants' Exhibits 3, 4, 5, 5a, 6. 6B, 7, 8E, and 10), in all of which he refers to the "lease" and the work being done by the "lessees" on the company's property. Some of them were enclosed with remittances of dividend checks, and some of them deal extensively with the work then being done by the lessees on the Adams property and the large expenditure made in doing the work. In 1902 Sylvester issued and sent to stockholders a printed statement of receipts and expenses of The Adams Mining Company covering the period from October 1, 1894, up to October 1, 1902, in which statement it appears that all receipts were royalties. With the statement, and as a part of it, was Sylvester's report as President, in which he reviews the condition of the property and its operation by lessees during the time covered by the statement, and therein again calls attention to the conditions under which the lease was given to Nicholson in January, 1899 (Complainants' Exhibit 8). And in December, 1903, James J. Sylvester as President, printed over his name as such another report to stockholders of receipts and expenditures of the company for the year ending November 1, 1903, in which it appears that all receipts were royalties. In 1904 (July 29th) only one dividend was paid (5¢ share), and in 1905 (February 27th) only one dividend (5¢ share). James J. Sylvester died in December, 1903, and in January, 1904, the Board of Directors elected W. W. Sylvester as President of the company to succeed his father. During the years 1904 to 1910 circular letters were issued and sent to stockholders by W. W. Sylvester as President of the company, as follows:

On January 12, 1904 (Complainants' Exhibit 12), circular letter announcing the death of J. J. Sylvester and the election of W. W. Sylvester as President in his stead was enclosed with drafts covering dividend No. 55. On July 27, 1906 (Complainants' Exhibit 12F) circular letter stating, among other things:

"The Adams mine, as you know, has been for a number of years operated by the Western Mining Company of Leadville, Colorado, under a lease," "some eighteen months ago the ores in the Adams levels upon which the lessees were working commenced to diminish in quantity and finally gave out altogether," and "under date of March 9th last the lessees reported a body of low grade ore in the Maid property which is dipping in the direction of the Adams."

On December 31, 1906, circular letter (Complainants' Exhibit 13). This letter embodies a copy of a letter to Sylvester from the Western Mining Company of date December 21, 1906, in which the Western Mining Company refers to the condition of the mine and the prospects for ore. Sylvester tells the stockholders in his circular letter that the letter from the Western Mining Company, copied as a part of his report, was in answer to a wire which he sent the lessees; and on December 24, 1909, circular letter (Complainants' Exhibit 14), which accompanied remittances to stockholders for dividend No. 62, which letter, among other things, says:

"The payment of this dividend has only been accomplished by most careful nursing of the royalties received from the lessees of the mine."

In 1910 there was no dividend paid, the next one after December 24, 1909, being on June 26, 1911, declared June 10th (5¢ share). In the circular letter of date June 26, 1911 (Complainants' Exhibit 15), which accompanied the remittance for dividend declared June 10, 1911 (No. 63), is said, among other things:

"Late in 1910, the lessees, who have been constantly working and spending their own money in an effort to discover something more were rewarded in the find of this carbonate of zinc. Nothing like it has ever been known in the Leadville camp. The past six months have been spent in retimbering eight hundred feet of shaft, opening up the ore, and putting the entire property in first class condition."

On December 6, 1911, another dividend was declared (4¢ share, No. 64) and was remitted enclosed with a circular letter of December 15, 1911 (Complainants' Exhibit 16). The letter congratulates the stockholders on the outlook for the mine and says that this is the second dividend—

"declared from the net earnings of the company from shipments of carbonate of zinc ore which was discovered about one year ago, and from which the first dividend was made last June."

It will be remembered that the extension of the lease given on June 1, 1904, would not expire until January 1, 1914; but on October 31, 1910, the President and Secretary of the Adams Company, with the approval of the Board of Directors, gave a second extension of the lease for a period of six years from the first of January, 1914, so that, as extended, it would not expire until January 1, 1920. Again, Nicholson testifies that in October, 1910, it had become necessary to retimber the Wolftone shaft, that the pumps were then handling 2200 to 2300 gallons per minute, their capacity, and it was necessary to provide for that if work was to continue, that other installations were needed, that they had six 125 or 150 horse power boilers and another one was needed to take care of the flow, that he went to both Moffat and Sylvester and told them of the discoveries of carbonate of zinc, the conditions at the mine and the required improvements that he would have to make, and asked for the extensions, that he thereupon obtained like extensions from both companies, and that when he got the extensions he proceeded to make the improvements and additions and to put in two more pumps at a station below, and that these cost more than $50,000. The recital to the resolution of the Board of Directors of the Adams Company granting the extension discloses that it was given because of the required improvements.

Sylvester testified that he did not know at the times the original lease and two extensions were given, nor until suit was brought, that there was any requirement that a mining lease should be authorized or approved by stockholders to render it valid. Several other witnesses who have had much to do with mining interests testified that it was generally believed at Leadville and in Colorado that no such ratification was necessary, and that such requirement was first called to their attention some time after the opinion was rendered in Westerlund v. Black Bear Mining Co., 203 Fed. 599, 121 C. C. A. 627, and

that theretofore it was the general practice to give such leases without submitting their approval or disapproval to stockholders' meeting.

After 1911, and prior to the institution of this suit on December 3, 1914, six dividends were declared and paid, as follows: In June, 1912, 4¢ per share; in December, 1912, 4¢ per share; in April, 1913, 4¢ per share; in June, 1913, 15¢ per share; in November, 1913, 10¢ per share, and in January, 1914, 40¢ per share. These were dividends Nos. 65, 66, 67, 68, 69, and 70. It is thus seen that the total amount distributed to stockholders on 150,000 shares as royalties received under the Nicholson lease, prior to the institution of this suit, is $226,500.00, the first payment being on May 20, 1900, and the last on January 2, 1914. During the time covered by the payment of the six dividends last-mentioned circular letters were issued by Sylvester as President and sent to stockholders, as follows: On June 20, 1912 (Complainants' Exhibit 17), a letter in which it is said, "Since the last one on December 15, 1911, the mine has been steadily worked by the lessees on the new carbonate of zinc which was discovered late in the fall of 1910;" and for the purpose of giving the stockholders some idea as to future prospects a lengthy quotation is made from a letter of June 6th from S. D. Nicholson, setting forth conditions at the mine. Dividend No. 66 was remitted with the circular letter of date December 7, 1912 (Complainants' Exhibit 18). Dividend No. 67 was remitted with the circular letter of date April 19, 1913 (Complainants' Exhibit 19). Dividend No. 68 was remitted with the circular letter of date June 21, 1913 (Complainants' Exhibit 21), in which "lessees" are mentioned. Dividend No. 69 was remitted with the circular letter of date December 2, 1913 (Complainants' Exhibit 23). Dividend No. 70 was remitted January 2, 1914.

The books of the company were audited in 1914 by certified public accountants, for a period from January 9, 1904, to December 31, 1913, and the report of that accounting is dated June 24, 1914. It was distributed among stockholders, but how extensively I cannot say, the latter part of that year. That report shows that of the dividends declared during that time only $549.18 then remained unclaimed. It also gives the data as to the giving of the lease and extensions, and the operation of the mine under same.

The evidence discloses that since the bringing of suit five more dividends have been declared (Nos. 71–75), as follows: One in 1915, 15¢ share; one in 1915, 12¢ share; one in 1915, 10¢ share; one in 1916, 5¢ share; and one in 1916, 4¢ share,—total, 46¢ per share—$69,000.00. Those dividends have all been received and retained by the stockholders, including the complainants, after they were fully advised of the bringing of this suit and of the general charges in and purposes of the complaint. The total amount thus disbursed to stockholders from royalties under the Nicholson lease at the time the proof was taken was $295,500.00, less a small sum unclaimed in the company's treasury. It will be observed that of the twenty-six dividends twelve were paid during the time covered by the original lease, nine were declared and paid during the time covered by the first ex-

tension, and the five paid after this suit was instituted was during the time covered by the last extension.

2. We now pass to another matter developed by the proof. A factional controversy arose long prior to the execution of the lease to Nicholson, between what is referred to as the Sylvester interests on the one side, and the Elder interests on the other side, as to which should control the management and operation of the company's property. It was manifested for the first time, as appears from the record, by the circular letter of October 18, 1890, issued by George R. Elder, attorney for these complainants (Defendants' Exhibit 195). Objection appears to be made in that circular to the amount of the salary which Sylvester was then drawing, and it requested stockholders to revoke any proxies that they might have given to the present management for the on-coming stockholders' meeting, and either send some one to represent them or give a proxy to George R. Elder. George W. Elder, his father, resided in Pennsylvania, and owned about 10,000 shares. George R. Elder himself owned a little less than that much. His brother-in-law, Frank F. Mann, either owned at that time or later acquired and now holds 3,000 shares, and other members of the Elder family owned small blocks, so that their total holdings were about 25,000 shares. James J. Sylvester and the members of his family owned half, or perhaps less than half, as much as the Elder family. Most of the remainder of the 150,000 shares was widely scattered. The company was originally controlled, and the greater part of its stock owned, by people living in or near New York City, but Sylvester came in as President shortly after the New York holders had sold a large part of their holdings to residents in St. Louis. The offices of the company were then moved there from New York City. Later, when Sylvester changed his residence to Kansas City the company offices were moved to that place. James Campbell, a noted financier of St. Louis, was one of the St. Louis purchasers, and he was on the Board for several years during the time covered by the Nicholson lease. There were about thirty stockholders who each held 1,000 shares or more in the company. Mr. Wood held 9,800 shares, Mr. Tobias 4,000, Mrs. Doyle 3,500, Sheppard Knapp 8,000, all of New York; and in St. Louis James Campbell held 4,700, and Edward Butler 2,400; D. R. C. Brown of Colorado held 8,370, and Helen S. Black 4,200. George R. Elder resided at Leadville when the lease was given, and has continued a resident at Leadville or Denver ever since. His father died in 1901, and the complainants here are his executors.

The controversy over control continued, being represented on the one side by James J. Sylvester, who desired to retain his position with the company, and later by his son, W. W. Sylvester, who succeeded him, and on the other side by George R. Elder. Sylvester was able to obtain sufficient proxies for each stockholders' meeting, up to the one held in December, 1913, to control stockholders' meetings, and also the stockholders' meetings held in the years following 1913. Sylvester had obtained a sufficient number of proxies which, added to his own holdings, gave him a majority of the issued stock for the meeting on December 18, 1913, but Elder, by his own efforts and the assistance of

Charles Claflin Allen of St. Louis, succeeded in inducing a number of stockholders who had given their proxy to Sylvester to revoke the Sylvester proxy and give a proxy to Allen or Elder, and these and other proxies obtained by Elder and Allen gave them and other Elder associates a majority. Sylvester evidently did not know of the revocations until he had called the meeting to order. Elder was present representing his own stock, and had proxies for 35,000 shares more. Allen was present. Elder had theretofore placed ten shares in Allen's name to qualify him as a stockholder. He had apparently done likewise as to Bryant and Malburn, attorneys of this city, who were also present. Frank E. Mann, a complainant, was present representing himself. These four were with Elder in the contest. Sylvester was aided at the meeting by Ewing, Nicholson, Rodman, Arnold, and Grant, he having theretofore placed ten shares each in the names of Arnold, Ewing, Nicholson and Rodman, to aid him in holding stockholders' meetings. He testified that he did this because they were the only people he knew in Colorado that he could get to attend the meetings. When Sylvester called the meeting to order Bryant, Elder and Allen announced that with their respective stockholdings they had sufficient proxies to constitute a majority of the issued stock. A heated controversy at once developed between the two sides. It resulted in the ignoring of the revocations of Sylvester's proxies, and that action gave Sylvester and those acting with him a majority. Nicholson was elected chairman of the meeting, and the meeting as thus controlled elected as directors for the ensuing year Broemelsick, Louderman, Waters, Grant, Sylvester, Rule and Ewing. No other action was taken by the meeting thus controlled by Sylvester. The lease to Nicholson and the extensions of it were not discussed or considered.

Elder and his associates withdrew and immediately held a stockholders' meeting. They found that they represented a majority of the issued stock, to-wit, 78,136 shares. The Sylvester meeting claimed to represent 111,392 shares. The Elder meeting elected as directors Bryant, Malburn, Allen, Mann, Elder, D. R. C. Brown and Ida Dull Elder, who immediately held a Board of Directors' meeting and nominated and elected George R. Elder, President, Charles Claflin Allen, Vice-President, and W. P. Malburn, Secretary. In a very few days after these meetings Elder brought a suit to oust the directors which the Sylvester meeting elected and the officers of the company which they named. That suit was not tried until early in 1916. Elder demanded possession of the company's books and the money then in the treasury. He brought suit to recover. He also notified the banks that held the deposit in Kansas City not to pay out any of the money except on his order, and the lessee not to pay any royalties to the Sylvester officers but to pay it to those elected by the Elder board. Elder won his suit to oust the Sylvester board in the trial court. An appeal was taken, and the Colorado Supreme Court decided (Grant v. Elder, 170 Pac. 198) that the stockholders' meeting for 1913 had not been called in accordance with the State statute, and that neither of the two meetings had been lawfully held. The result of this was that the directors and officers who were in at the time the meeting was called held over.

A bitter controversy between Elder and Sylvester immediately followed. It took the form of circular letters addressed to the stockholders of the Adams Mining Company, each claiming to be the President of the company. When the stockholders' meetings for the following years came on the fight between Sylvester and Elder for proxies was renewed. Elder and his board called stockholders' meetings, and Sylvester and his board called stockholders' meetings, but the Elder side was not able at any time to hold stockholders' meetings for the reason that they could not get a representation of a majority of the stock. The majority went back to the Sylvester management, and the meetings as called by him were held and he has been continued as President of the company. As already stated, no action was taken at the Sylvester stockholders' meeting in 1913 in reference to the Nicholson lease, but in the minutes of the Elder stockholders' meeting is found this:

"Motion made and seconded that the directors and the officers of the company be directed to inquire into the last lease made of the Adams Mining Company's property with a view to ascertaining both its legal and its practical aspect, and to determine whether it is a lease binding in law, and if not, that action be taken with reference thereto such as to best subserve the interests of the company. Motion unanimously agreed to by all the stock present."

3. The complainants took before the Master the testimony of some forty-five stockholders and executors or administrators of estates holding stock in New York and St. Louis, their total holdings being about 35,000 shares. Eleven of them held over 1,000 shares each; the other holdings were each less, and as low as 5 shares. None of them had ever seen the original lease or extensions, or copies of them, until after this suit was brought. They did not know the dates on which any of them were given, nor the dates of expiration. They first learned those facts from circulars sent out by George R. Elder after the suit was brought, or from conversations recently theretofore with him. They all testified, with perhaps one or two exceptions, that they knew at all times that the company's property was leased, and that they knew this from the receiving of dividends or from circular letters issued by the company, and some from conversations had with Sylvester and some from general talk that they had had about the property and their interest in it. Those who stood in representative capacity had no information prior to the time that some stockholders' interests came into their hands. The knowledge of some was slight; they were interested only in dividends, and did not read all of the circulars; but they knew that the company's property was being operated under lease. Of course they constitute a small proportion of all of the stockholders, but their testimony is a fair indication as to the extent to which all stockholders were advised, from some source, that the property was at all times being operated by lessees. None of them, and no other stockholders except George R. Elder and his wife, Ida Dull Elder, has offered to intervene as a complainant in this suit and share in bearing the expense of the litigation.

George R. Elder has at all times since January, 1899, and for years theretofore, taken an active interest in the company's affairs, both on

account of himself and the other members of his family, and since his father's death, of his father's estate. This is shown from his testimony, the testimony of his brother, Rufus C. Elder, the testimony of his brother-in-law, Frank E. Mann, and from correspondence between them. He knew from Nicholson that he expected to get the lease before he got it in January, 1899. In October of that year he went to the County Recorder's office and read the recorded copy of the lease. He received a copy of Complainants' Exhibit 2, issued in October, 1899, announcing the consummation of the lease and stating the amount of work that was done on the shaft up to that time. He received Complainants' Exhibit 3, dated in April, 1900, which again refers to the prosecution of the work by the lessees. He received Complainants' Exhibit 4, issued May 10, 1900, which again refers to work by the lessees. He received Complainants' Exhibit 5, issued in November, 1900, referring to work being done by lessees and the improvement being made on the Adams mill; and numerous other exhibits in the following years, viz.: Complainants' Exhibits 5a, 6, 6B, 6D, 7, 8a, 10, 11, 12, 12A, 12B, 12E, 12F, 13, 14, 15, 16, 16A, 17, 18, 19, 20B, 21, and 23. Exhibit 6B is a circular letter issued in 1902, and refers to the lessees; Exhibit 7 is a circular letter issued in 1902, and refers to the lessees; Exhibit 8 is the annual report of 1902, and refers to the operations of the lessees; Exhibit 10 is a circular letter issued in May, 1903, and refers to the operations of the lessees; Exhibit 11 is a circular letter of December, 1903, containing a financial statement and notice of death of Sylvester; Exhibit 12F is a circular letter of July, 1906, referring to the operations of the lessees; Exhibit 13 is a circular letter of December, 1906, containing a reference to and embodying the letter of the Western Mining Company as a part of it; Exhibit 14 is a circular letter of December, 1909, referring to the royalties received from the lessees of the mine; Exhibit 15 is a circular letter of June, 1911, and refers to the discovery of carbonate of zinc by the lessees; Exhibit 17 is a circular letter of June, 1912, giving notice of dividend and stating that since December 15, 1911, the mine has been steadily worked by the lessees on the new carbonate of zinc ore. It embodies an excerpt from a letter from Nicholson referring to the carbonate of zinc ores discovered in 1910; Exhibit 21 is a circular letter of June, 1913, giving notice of dividend and operation of lessees. The others are dividend notices and letters.

Elder testified that Nicholson told him in December, 1911, that he had a new lease from the company; that he talked with Nicholson about the mine in 1910; that he heard some time in November or December, 1913, that Nicholson's lease would expire in 1920; that he saw Sylvester and Nicholson at Leadville together in June, 1911, and talked with them about the property.

"I never had any conversation with Mr. Nicholson with reference to extension of the leases until some time in the end of December, 1911, in the City of Denver, and I asked him if he got a new lease, and he said he had gotten a new lease. That was the first and the only time I had any talk with Mr. Nicholson about his having an extension of any part of the lease on the property."

Nicholson did not say when it expired.

Q. What did you know about the operation of the property of The Adams Mining Company between the year 1908 and the year 1914, prior to the year 1914? A. I knew that it was worked under some form of lease.

Q. Where did you get that information? A. I got that information from the circulars of the Adams Mining Company, like those circulars of 1906 and circulars following, stating that there were lessees in the possession of the property.

"I saw Mr. Nicholson considerably during the fall and winter of 1911 and 1912, and I asked him to give me a statement of the tons of ore shipped and the value of the production from the Adams mine."

Q. You knew that the Western Mining Company was operating the property in 1909? A. I had reason to believe they were.

Q. You didn't inquire? A. I didn't inquire, I did not even know that they had a lease until 1911. I asked Mr. Nicholson if he had a new lease and he said he had.

Q. In 1910, under what right was the Western Mining Company operating the Adams properties? A. I don't know.

Q. Well, what did you think about it? A. I believed perhaps they had gotten some kind of a lease.

He thought he talked with Nicholson about it in June, 1910.

George E. Keeler testified that Elder told him about November, 1910, that Nicholson had told him (Elder) that he had recently returned from the East and had his lease on the Adams property renewed, and that Elder mentioned the renewal several times after that. Elder testified that he could not remember any conversation of that kind. He said in April or May, 1911, Keeler told him that Nicholson had gone East in the fall of 1910 to get a new lease from the Adams Mining Company, and that that was the first intelligence, and the only intelligence, that he had that Nicholson had gone for such a new lease. On being asked what he understood Nicholson meant when he told him that he had a new lease Elder answered:

"I thought by that he meant he had a new lease from January 14, 1909, probably ten years.

"Q. Probably ten years? A. Yes.

"Q. That would run it until January, 1919? A. That was my thought about it."

He said when he received dividends he knew they were paid from royalty returns under the lease. On June 17, 1912, George R. Elder wrote Sylvester a letter on his Leadville office stationery (Complainants' Exhibit 16B), as follows:

"I have frequently asked Mr. Nicholson to furnish me with a monthly statement of the royalty proceeds paid each month to the Adams M. Co. but he has always declined to do so. He asked me to write you for these facts, and also for you to furnish him with authority to give me these facts. I now write you asking for a detailed statement of the income and expense accts. of the Adams Co. to this time. As no statement of this company had been made for years it is high time that some statement be made to all the stockholders. Very Resp. George R. Elder."

Elder issued a printed circular letter to stockholders of date December 1, 1913, and in that letter he makes the statement that Sylvester, as President, extended the lease on October 1, 1910, to expire January

1, 1920 (Defendants' Exhibit 76). He was asked when he got that information, and this is his answer:

"I obtained the specific information that the lease was extended to January 1, 1920, on October 31, 1910, from Hiram Knapp in New York, in the end of August or the first few days of September, 1913, and I am of the impression Mr. Sylvester mentioned the expiration of the lease as January 1, 1920, and October 1, 1910 as the date it was signed, on the 8th day of September, 1913. I also had a conversation with Judge Daly, attorney for the Sheppard Knapp estate, at the same time that I saw Hiram Knapp; and I think I obtained some of that information from him; and during the fall after the 8th of September I had that confirmed by somebody at Leadville."

Elder went to the company's office at Kansas City in the spring of 1913 and asked Sylvester to let him examine the company's books. Sylvester refused. Elder went away. Sylvester took counsel, and then wrote Elder on May 19, 1913, that he was in error in refusing him the right to examine the books, and that he was at liberty to make the examination. He went back in September, 1913, and made an examination, and Sylvester testified that during that examination Elder asked to see the lease; that he handed the lease to Elder, and that attached to it were both extensions, and that Elder examined them. Elder denies this. He said:

"In 1906 I must have had some conversation with Mr. Nicholson with reference to his work up there, and he may have used the name of 'the Western Mining Company' to me."

He knew that that company was operating these properties. He probably talked with Nicholson in 1907 and 1908. He knew production in 1908 and 1909 was low.

Q. And all during 1911 you knew that the Western Mining Company was operating, and you thought it was under a new lease? A. Well, I presume that I thought there was a lease of some kind on the property.

Rufus C. Elder was at Leadville in the summer of 1904, and he and his brother George went down into the mine during that time with Nicholson. Nicholson testified that he had talked with George R. Elder late in 1910 about the last extension, and that he told him that extensions had been made on all the properties, and that the lease ran to 1920. He also testified that in 1911 or 1912 he took Robert D. Elder, son of George R., and associate counsel in this case, all through all parts of the company's property that were open. He further said that Elder talked with him frequently about the production, and that he gave such information until Sylvester objected and wrote that the place for Elder to get that information was at the Adams Company's office; that Elder said that the reason he wanted the amount of production was to keep a check on Sylvester; that he told Elder that if he would get an order from Sylvester he would continue to give him that information, otherwise not. He did not get an order. This was about in 1904.

William Angus testified that George R. Elder told him in Elder's office at Leadville, late in April or early in May, 1909, that the property was at that time leased to the Western Mining Company.

Rufus C. Elder, a complainant, did not personally own any stock until 1913. He was a witness, and said that he received Complainants' Exhibits 6B, 7, 8, 8E, 9, 10, 10A, 11, 12, 12A, 12B, 12F, 13, 14, 15, 16, 16C, 16D, 16E, 16F, 16H, 17, 18, 19, 20C, 20D, 21, 22, and Defendants' Exhibit 76, and that complainant Mann saw the notices that he got. Among these are circular letters sent out by Sylvester in 1902, 1903, 1906, 1909, 1911, 1912, and 1913, in which it is said that the property was operated by lessees. Exhibit 20C is a letter from Sylvester to Rufus C. Elder, of date May 16, 1913, mentioning the lessees being in operation of the property. He testified that he left the matter largely to his brother, George R. He was asked this question:

Q. Now, I will ask witness what was your knowledge of the manner in which the property of the Adams Mining Company was being operated during the time between the time you became executor in 1901 and the year 1914? A. I knew that the property of the Adams Mining Company was operated under a lease, and I did not know to whom except I knew that S. D. Nicholson was the manager.

Q. How did you obtain that information? A. I got that information from G. R. Elder, and also from the fact that I met Mr. Nicholson and he seemed to be the man in charge there at the mine.

Q. Since 1901 you have known constantly that it was operated under a lease? A. I think so.

Q. Was anything ever said by your brother to you during the course of the so-called campaign in 1913, or any time during 1913, about the lease? A. No, sir. That, I said yesterday, it was after January 1st (1914). I know now it was after January 14th when I learned that from Mr. Mann, on account of the letter I saw.

Q. You learned of what? A. That I learned of the existence of these leases and that they had not been ratified by stockholders' vote.

Q. But you knew all the years before that there was a lease, didn't you? A. Yes.

Q. And that had never been discussed between you and your brother? A. No,—that is, except that the property was leased.

Q. When did you first discuss with your brother the bringing of this action, Mr. Elder? A. 1914, some time in the latter part of the year, I think. He may have written something about that in 1914.

He testified that he first learned in January, 1914, of the extensions. He got that information from F. E. Mann, and afterwards from George R. Elder, and knew during all the years before that there was a lease. Complainants' Exhibit 20C, which he admitted receiving, is a letter dated May 16, 1913, addressed to him by Sylvester as President. It calls his attention to the fact that George R. Elder had recently been in Kansas City, and spent the best part of a day going over matters pertaining to the Adams Company, and says that George Elder has probably given him a synopsis of its condition. It further says that:

"For many years, as you know, the Adams was practically an exhausted property. * * * This condition existed until the fall of 1910 when the Lessees commenced shipping the new Carbonate of Zinc Ore, which was discovered about that time. In the early stages of this discovery, it was impossible to forecast the quantity or quality of this find. * * *"

It says that as shipments increased he determined on the policy of building up a surplus in the treasury to "tide us over any reasonable period of ore exhaustion"; that he had talked with many of the stock-

holders regarding the policy, and that at the last stockholders' meeting a resolution was passed to accumulate a surplus until it reached $75,-000; it sets out that resolution; it says that Mr. George Elder insists on the distribution of the major part of the surplus at once, and closes:

"I will appreciate your and Mr. Mann's views on the soundest and safest policy of the old Adams."

No answer was made to this letter.

Frank E. Mann testified that he got Complainants' Exhibit 1, which is a circular letter sent by Sylvester, dated June 10, 1899, advising stockholders of the completion of the lease to run for ten years; Complainants' Exhibit 8, which was the annual report of 1902, showing receipts and expenditures from November, 1894, to October, 1902, and referring to the lessees; Complainants' Exhibit 13, a circular letter dated December 1st, 1906, embodying a letter from the Western Mining Company on the condition of the mine; and Complainants' Exhibit 11, a circular letter dated December 23, 1903. His counsel asked him this question:

Q. State in your own words just what you knew prior to the year 1914 concerning the manner of operating the property of the Adams Mining Company during any portion of the period from the year 1899 to the year 1914? A. Well, in 1899 the Adams Mining Company, J. J. Sylvester, President, notified us that he was giving this lease, and my information after that, I presume, was that they were working the lease, and I received advices in 1906 that the Western Mining Company was operating it, and had been for some time, but I had not been notified; then in the same year that the Western Mining Company, S. D. Nicholson was general manager; and then in 1912; and as the time went on through I would receive a dividend of four cents every once a year; may be four or five years nothing at all; and then another time a five-cent dividend for twice that year. That is the evidence that I had that they were working—busy.

He was shown dividend checks payable to himself, and those sent to him and Rufus C. Elder on the estate stock. He of course admitted that those dividends had been received, and was asked:

Q. And during that time you knew these dividends were paid out of royalties received from operations by the lessees, didn't you? A. Yes.

## II.

We now set out the material facts on the issue raised by the answers as to whether there has been express ratification of the lease and extensions at stockholders' meetings. The stockholders' meeting held in 1902 involves the inquiry as to whether the lease only was ratified, the extensions not then having been made, and the ones in 1911 and 1915 involve the inquiry as to whether the lease and both extensions were ratified at those meetings.

The Adams Mining Company was organized as a corporation in 1883, by the consolidation of the Saint Bernard Mining Company and the Brookland Mining Company. It appears that a certified copy of the action taken at stockholders' meetings of the two companies last-named, authorizing the consolidation, was filed with the Secretary of State on December 5, 1883. It sets forth the articles of incorporation of the new company. By Article 6 Leadville was designated as the

principal place and business office of the new company, with branch offices in New York and Chicago, where meetings of officers, directors and stockholders could be held. Article 7 gave the directors (named for the first year) and their successors in office "power to make such prudential by-laws as they may deem proper for the management of the business affairs of said company not inconsistent with the laws of the State of Colorado."

The corporate life of a domestic corporation expired at the end of twenty years, under the State statute, and in 1903 a meeting of the stockholders of the Adams Mining Company was called and held, at which its corporate life was extended for another twenty years. A properly certified copy of that action was filed with the Secretary of State July 20, 1903.

In 1887 James J. Sylvester as President, and William M. Curtis as Secretary, certified that at a special meeting of stockholders of the company held in Leadville on November 17, 1887, Article 6, supra, had been amended by the requisite number of votes (137,000 shares) by naming St. Louis, Missouri, also as a place for meetings, and said certificate was filed with the Secretary of State December 7, 1887.

Again, in December, 1892, James J. Sylvester as President, and W. W. Sylvester as Secretary, certified that at the annual stockholders' meeting of the Adams Mining Company held in Leadville, Colorado, November 17, 1892, there being 101,926⅜ shares represented, a resolution was passed authorizing the directors to include Denver, Colorado, in the list of places where annual meetings of stockholders might be held, and that the directors had taken such action. This certificate was filed with the Secretary of State January 3, 1893.

Again the stockholders were notified in the notice calling an annual meeting at Denver, on Thursday, December 28, 1911, that amendment of Article 6 would be considered, and after that meeting Sylvester as President, and Rule as Secretary, certified that at that meeting Article 6 had been amended changing the principal office of the company from Leadville to Denver, and that part of the business of the company "shall be carried on in the cities of Kansas City and St. Louis, Missouri, at which offices meetings of the directors may be held." The certificate was filed with the Secretary of State January 2, 1912.

The only by-laws of the company which appear in the record are those introduced by complainants. They are entitled:

"New By-Laws
Adopted by Stockholders at Their Meeting December 28th, 1911.
Adopted and Approved by
The New Directory at Special Meeting Jan. 3, 1912."

And by Article 5 it is provided:

"There shall be an annual meeting of the stockholders of this company held on the 2nd Wednesday of December each year at the principal office of the company in the State of Colorado. * * *"

It does appear that the Board at a regular meeting held September 10, 1887, adopted new by-laws, but those by-laws are not in evidence,

nor the ones that existed prior thereto. The Master, in his report, quotes this as one of the company's by-laws:

"There shall be an annual meeting of the stockholders of this company, held on the last Thursday in November in each year, in the city, county and state of New York, or in the City of Leadville, State of Colorado, as may be determined by a majority of the board of directors."

The record does not disclose such a by-law. It does disclose, however, that at the taking of testimony in New York City the "old minute book" was presented to the Master and the complainants' counsel called his attention to certain pages which he asked to have marked as an exhibit. I think it fair to indulge in the presumption that the Master got the by-law which he quotes from that old minute book; but it will be observed that the Board adopted new by-laws on September 10, 1887. We do not know what they are, but it is highly probable that the by-law quoted by the Master was then changed for the reason that control of the stock had passed from New York holders, and the company's office about that time was moved to St. Louis. A special meeting of the stockholders had been held on November 17th of that year, amending the articles by providing that meetings could be held at St. Louis. In addition, all annual meetings of stockholders thereafter, at least six in number, up to and including November 19, 1896, were each held on the third Thursday in November, and the next annual meeting of stockholders, after 1896, was also called and held on Thursday, November 20, 1902. The annual stockholders' meeting for 1887 was held on Thursday, November 17, as shown by the Board's records, and annual meetings of stockholders were held thereafter on the third Thursday in November, for 1888, 1889, 1892, 1894, and 1895, and there is slight evidence from those records that meetings were called on like dates in 1891 and 1893.

An annual stockholders' meeting was held November 19, 1896. No meeting was called thereafter until the one called for Thursday, November 20, 1902, at which time it was held at Denver. The call was signed by Jas. J. Sylvester as President, and W. W. Sylvester as Secretary, and bears date October 20th. At this meeting stockholders present owned 15,200 shares. Of this number James J. Sylvester owned 12,400 and George R. Elder 2,700. The other stockholders present, Anderson, Parsons, Nicholson, Heney, Donnen and Schumacher each had ten shares, which Sylvester testified had all, I think, been put in their names for convenience. Sylvester also had proxies for 95,600 shares, and Elder for 31,500 shares, making a total of 142,300 shares represented. Nicholson was elected chairman of the meeting. At this meeting the following persons were elected directors: James J. Sylvester, W. W. Sylvester, W. D. Waters, James Campbell, A. D. Grant, H. B. Louderman, Jr., and J. F. Broemelsick. The record of that meeting discloses that the chairman read to the meeting the report of the President of the company for the year ending November 1, 1902, that the report was received, and on motion duly seconded the same was approved and ordered to be filed with the secretary of the company. This report is Complainants' Exhibit 8, giving the receipts and disbursements from November 1, 1894, to October, 1902, and in

it the President mentions with some detail the fact of the giving of the original lease on the Adams properties and leases on those adjoining, and the work that was to be done on the Wolftone shaft. It also calls attention to the fact that the last election was held in November, 1896, that personal communication had been had with a large majority of the stockholders in succeeding years and that they had exhibited indifference to holding an election and had failed to provide the necessary representation, and—

"This year, however, I deem it best to order an election be held the third Thursday in November, to-wit, November 20, 1902; then and there to elect seven directors. I trust our stockholders will realize the importance of it by sending in the proxies promptly, as their action will be considered as an endorsement of my official career and approval of all the acts herein set forth by this administration up to date. Respectfully submitted, Jas. J. Sylvester, President."

This action is claimed by the defendants to be an express ratification of the lease by the stockholders.

The meeting held on December 28, 1911, is represented by the record of that meeting as being an "annual stockholders' meeting." There were 107,743 shares represented. Nicholson was chosen chairman of the meeting, and S. D. Nicholson, W. A. Rule, W. W. Sylvester, A. D. Grant, W. D. Waters, H. B. Louderman, Jr., and J. F. Broemelsick were elected directors for the ensuing year. Sylvester testified that inasmuch as a stockholders' meeting had not been held since 1902 he desired to have all action taken by the Board since that time approved, and that he read to the meeting all minutes of the board from that time to the time of the meeting, which included the two extensions of the lease, made respectively in 1904 and 1910, and that thereupon, as shown by the minutes of the meeting, a resolution was adopted ratifying all that had been done by the Board. The minutes of the Board of Directors, however, show that this stockholders' meeting was not called until December 6th, which was less than thirty days prior to the meeting. The State statute required that notice of annual stockholders' meetings at which directors should be elected, shall be published not less than ten days previous thereto in a newspaper nearest the place in which the principal office of the company shall be kept, and by delivering personally or depositing in the post office at least thirty days before such meeting a notice properly addressed to each stockholder. The action taken at this meeting is also claimed by the defendants to be an express ratification. No one in any way connected with the lease was put on the Adams Company Board until long after both extensions were given.

The annual stockholders' meetings for 1912 and 1914 were held on the second Wednesday of December in those respective years, but no action was taken in relation to the lease.

The annual stockholders' meeting for 1915 was held on Wednesday, December 8th. The notice of that meeting is signed by Sylvester as President, and Rule as Secretary, and it recites that the Board of Directors ordered the meeting called. It was to be held, according to the notice,

"for the purpose of electing seven directors for the ensuing year, and for the transaction of such other business as may properly come before said meeting."

The record of the meeting, set out in full, shows that notice, both by publication and mailing, had been given for the full time required by the statute. Those present at the meeting were, W. W. Sylvester, Frazer Arnold, S. D. Nicholson, Julius Rodman, M. J. Spears, Frank J. Mannix, J. B. O'Connell, and Robert D. Elder. Arnold was elected chairman and Spears secretary of the meeting. It does not appear that Mr. Elder participated at all in any action there taken. The record recites that he then held 112 shares. Sylvester personally had 11,500 shares, Arnold 100, Nicholson 10, Rodman 10, Spears 11, O'Connell 10, and Mannix 10. Nicholson was proxy for 8,370 shares owned by D. R. C. Brown, and Sylvester had proxies representing 68,573 shares. A resolution expressly ratifying the lease to Nicholson, given on January 30, 1899, the action of the Board of Directors on June 1, 1904, ordering and empowering the President and Secretary to give the first extension of said lease from January 14, 1909, to January 1, 1914, and the action of the Board at a meeting held December 20, 1910, confirming and approving the making of the second extension of the lease from January 1, 1914, to January 1, 1920, was adopted. The total shares voted was 88,574, all in favor of the resolution. The record sets out the number of shares voted by each one present, both as to the number he owned and those which he represented by proxy. Nicholson did not vote the ten shares which stood in his name, but voted as proxy for Brown the 8,370 shares. He testified that he did so because Brown had recently theretofore told him that he approved what the Board had theretofore done. But without Brown's stock there was a majority of issued shares in favor of the resolution ratifying the lease and both extensions. This action is claimed by the defendants to be the third express ratification by stockholders of the giving of the original lease, and the second express ratification by stockholders of the two extensions.

From the foregoing facts I will only state my conclusions. Applicable authority in support may be found extensively cited in the Master's Report.

[1] (a) There is no evidence to sustain the charges of conspiracy and fraudulent conduct on the part of the lessee in obtaining the lease and two extensions, and of the officers of the Adams Company in giving them. There was no concealment, nor agreement to conceal, those transactions between the officers of the Adams Company and the lessee. George R. Elder was refused permission to examine the company's books by Sylvester, President, in the spring of 1913, but Sylvester shortly after wrote him that he had made a mistake, and that Elder had a right to examine the books, and Elder then went and made the examination. Elder got from Nicholson during the early part of the lease full data as to ore shipments and smelter returns. When Sylvester found this out he notified Nicholson to discontinue giving that information to Elder, saying the place for him to get it was from the Adams Company, and when Elder again demanded the information

Nicholson told him what Sylvester had said, and advised him that if he would get an order from Sylvester he would continue to give him the information. Elder also requested Sylvester, more than once, to issue monthly statements to stockholders giving full data as to tonnage output, values and smelter returns. Sylvester did not comply with these requests from Elder, but there is no evidence that Sylvester's conduct in those respects was, in either instance, induced by or even suggested on the part of any one representing the lessee. Even if Sylvester's action or non-action in those particulars could be held to be fraudulent concealment it would be wholly immaterial to the issues in this case, there being not the slightest proof tending to show that the lessee participated with Sylvester or advised him thereto. And in addition there is no proof that any other stockholder at any time complained of not being given all the information that he desired by the Adams Company officers. Indeed, there is slight, if any, evidence that any stockholder other than George R. Elder ever made demands on Sylvester for data in reference to the company's affairs, unless it can be inferred that all of the other interests of the Elder family were represented by George R. Elder in the demands which he made.

No evidence was offered tending in the slightest way to show that the royalties specified in the Nicholson lease were trifling or unreasonably low. They were uniform in all three of the leases and extensions obtained at the same time. That element in the case, now practically abandoned in argument and brief of complainants, would not be a badge of fraud unless the royalties were so low and grossly inadequate as to shock the conscience of the Chancellor, unless other fraudulent conduct were coupled therewith. Nicholson is severely criticised on account of his holding as chairman at the stockholders' meeting in November, 1902, that Elder did not have the right to vote the shares which he represented cumulatively for directors. When that question arose at that meeting Mr. C. C. Parsons, the company's attorney, was called on for his advice as to whether or not the right of a stockholder to cumulatively vote his shares applied to a mining company. He took counsel with Mr. Robinson, his associate, and then advised the meeting that the right did not exist. Nicholson, in denying the right, acted upon this advice. Nicholson was also chosen chairman of the annual meeting called for December 28, 1911, and of the annual meeting on December 18, 1913, which the Supreme Court held to be void and illegal. He co-operated with Sylvester in ignoring the right of the majority of the stock held by Elder and his associates to control that meeting. The conduct of Sylvester and his associates at that time, including Nicholson, was and has been justly subjected to grave censure. For one or two years Nicholson accepted election as a member of the Board of Directors of the Adams Company. Even if his conduct, and that of Rodman, who was also a stockholder in the Western Mining Company, lessee, should be held to be fraudulent in so far as they aided the Sylvester faction in its contest with the Elders, still that conduct on their part had no connection whatever with the giving of the lease and the two extensions. Nicholson, Rodman, and Ewing were only nominal stockholders; they had no interest in the Adams

Company to protect. They took ten shares each merely to accommodate Sylvester and in enabling him to hold stockholders' meetings, and thus were imprudently drawn into the controversy between Sylvester and Elder over which faction should control the company. This conduct on their part is the only thing in the entire record that has the slightest tendency to arouse even a suspicion that the giving of the lease and the two extensions might have been the result of a fraudulent understanding between Sylvester and the lessee. But after a consideration of all of the facts disclosed by the record I am convinced that there is no proof which sustains the charge, and therefore find that the complainants have failed in that respect.

[2] (b) With the charge of conspiracy and fraud between the lessor and lessee out of the case it is doubtful that there would be any ground left on which a cause of action could stand to cancel the original lease and the first extension, because both of them had been fully executed at the time the suit was brought. But that aside, I find, as the Master found, that the defenses of estoppel to those two causes of action have been fully made out. Indeed, the proof is all one way and overwhelming to the effect that all stockholders, including the complainants, knew during all the time covered by the original lease and the first extension that the property was being operated by the lessee. They knew it from the circular letters issued by Sylvester as President. They knew the dividends which they were receiving during that time came from royalties paid to the company by the lessee. With that knowledge they stood by during all of that time and received those dividends, and thereby acquiesced in the operation of the property by the lessee and impliedly approved and consented to the rights claimed by the lessee to operate the property as such. It was not necessary, to the ripening of a complete estoppel against them to challenge the rights given by the lease and extension to the lessee, that they should know the specific terms of the lease and all of its provisions. With knowledge that the lessee was operating the property, and that the dividends which they were receiving were being paid from royalties under a lease they could not shut their eyes against further inquiry and then claim the right in a court of equity to oust the lessee if that, at some future time, might seem to their advantage. They are estopped by that conduct.

(c) George R. Elder read the recorded copy of the original lease in 1899. He knew in 1910 and 1911, after the date of its expiration, that the Western Mining Company was continuing in the operation of the property. He admittedly learned from Nicholson in December, 1911, that the lessee had acquired rights as such covering a period after the expiration of the original lease. In referring to what Nicholson said he testifies:

"I thought by that he meant he had a new lease from January 14, 1909, probably ten years.

"Q. Probably ten years? A. Yes.

"Q. That would run it until January 9, 1919? A. That was my thought about it."

He further testified that he first learned of the "extension" in the latter part of August or early in September, 1913. He issued the cir-

cular to stockholders, of date December 1, 1913, in which he advised them that Sylvester as President extended the lease on October 1, 1910, to expire January 1, 1920. He looked after the interests of complainants as stockholders of the Adams Company, and of his father's estate as a stockholder whom the complainants represented. The complainants testified that they learned in January, 1914, of the extension of the lease. The suit was not brought until December 3, 1914, and with that knowledge they continued to receive their dividends, both before and after they brought this suit,—one in November, 1913, of 10¢ per share; one in January, 1914, 40¢ per share; three in 1915, aggregating 37¢ per share; and two in 1916, of 9¢ per share. And on these facts, both as to delay of from eleven to fifteen months in bringing suit after knowledge of the extensions, and also on receipt of dividends after suit was brought, I agree with the Master that the complainants are estopped from maintaining this action to cancel the second extension, and that all other stockholders are likewise estopped, it substantially appearing that they, too, had knowledge of these facts. None of them except George R. Elder and Mrs. Elder, have asked to intervene as parties complainants.

(d) The defendants claim ratification of the original lease at the annual stockholders' meeting held on Thursday, November 20, 1902. That meeting was held on the same Thursday of the same month as the seven preceding annual meetings had been held. 142,300 shares were represented at this meeting. I find that this meeting was properly called for the proper time, and that it was a lawful meeting. As already noted, two other preceding annual meetings were called for the same Thursday of the same month, but it is uncertain from the record whether they were held, on account of the lack of a quorum. The next annual stockholders' meeting was held on December 28, 1911. There were 107,743 shares represented. This meeting was not called for the proper day, to-wit, the third Thursday in November. It was a deferred annual meeting. It was necessary that the Board call it. The Board made the call, but not until December 6th, which was too late to give the required thirty days personal notice. I therefore find that this meeting was void. This is the meeting of stockholders that undertook to adopt new by-laws. That power is vested in the Board of Directors by the Articles of the Association, and the proof shows that these by-laws were adopted by the Board on January 3, 1912. They require that annual stockholders' meetings shall be held on the second Wednesday of December, each year. At the void 1911 stockholders' meeting, the minutes of that meeting represent the following elected as directors: S. D. Nicholson, W. A. Rule, W. W. Sylvester, A. D. Grant, W. D. Waters, H. B. Louderman, Jr., and J. F. Broemelsick. That Board adopted these new by-laws on January 3, 1912. There had been no meeting of the stockholders since 1902. At the 1902 meeting, which was a regular meeting, directors then elected were: James J. Sylvester, W. W. Sylvester, W. D. Waters, James Campbell, A. D. Grant, H. B. Louderman, Jr., and J. F. Broemelsick. James J. Sylvester and James Campbell were both deceased when the 1911 meeting came on, so that the meeting in 1911 undertook to put Nicholson and

Rule in their steads. It thus appears that five of the seven directors elected in 1911 had held over since the election in 1902. So that whether we regard the new Board as a de facto Board or only consider the five hold-over directors as properly in office, the new by-laws were legally adopted by the Board on January 3, 1912, whereby future annual stockholders' meetings were fixed on the second Wednesday of December, each year. The annual stockholders' meeting for 1912 was held on the second Wednesday of December, and likewise the one for 1914. The annual stockholders' meeting for 1915 was properly called and held on the second Wednesday of December, to-wit, December 8th. At that meeting, as already pointed out, there was an express ratification of the original lease and both extensions. But I am in doubt as to whether the action taken at the meeting in 1902, and at the meeting in 1915, was in either instance a valid ratification by stockholders of the lease, or of the lease and two extensions; and for the purpose of the final determination of this case it is not necessary to solve that doubt. The doubt arises from the State statute itself (Rev. St. 1908, § 865). It takes from the Board of Directors the power which it theretofore exercised of making a lease. It provides that such action by the Board, without the consent of the stockholders, shall be absolutely void until the question shall have been submitted at a proper and legal meeting of the stockholders, and a majority of all the shares of stock shall have been voted in favor of such proposition. I question whether the statute does not require that the notice calling a meeting, whether it be annual or special, for the purpose of approving a lease, should not notify the stockholders that that question would be submitted at the meeting; and if so, whether a like notice is not necessary at a meeting at which the question of ratification is to be submitted. Some authority has been offered holding that any and all business of a corporate character can be submitted to, considered by, and acted on by stockholders at an annual meeting without its having been theretofore specified in the notice calling the meeting. But there is also some authority to the effect that business of great importance, and of an extraordinary character, cannot be transacted at a stockholders' meeting in the absence of representation of all of the stock, unless the notice specifies that extraordinary matter for consideration. 1 Morawetz, § 482 (2d Ed.). So I leave the question undetermined. It results in this, that the court sustains the findings and conclusions of the Master that complainants and all other stockholders are estopped to maintain this suit, that the finding of the Master that the stockholders' meeting held in 1902 was void is overruled, and that the finding of the Master that the stockholders' meetings held on the second Wednesdays in December, 1912, 1914, and 1915, were void meetings is likewise overruled, and the court finds that those meetings were called at the proper times on the proper notices, and were valid and legal stockholders' meetings.

All of the complainants' exceptions to the Master's Report are overruled. Defendants' exceptions to the Master's Report, numbered First, Second, Fourth, Fifth, Seventh, Tenth, and Eleventh are sustained, and the Third, Sixth, Eighth, Ninth, Twelfth, Thirteenth, and Fourteenth are overruled. An order will therefore be entered taxing, as a part of

the costs against the complainants and in favor of the defendants, five dollars ($5.00) on each of complainants' exceptions overruled, to-wit, two hundred dollars ($200.00), and against defendants and in favor of complainants on each of defendants' exceptions overruled, five dollars ($5.00), to-wit, thirty-five dollars ($35.00).

An order will therefore be entered as recommended by the Master, that the bill be dismissed at the costs of complainants, including the Master's allowance.